Robert L. Starr (183052)
robert@starrlaw.com
Adam M. Rose (210880)
adam@starrlaw.com
**LAW OFFICE OF ROBERT L. STARR, APC**
23622 Calabasas Road, Suite 320
Calabasas, CA 91302
Telephone: (818) 225-9040
Facsimile: (818) 225-9042

Attorneys for Plaintiff Isabel Pang

# UNITED STATES DISTRICT COUTT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ISABEL PANG, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GENERAL MOTORS, LLC, and DOES 1 to 10,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR:**<br><br>Violation of Bus. & Prof. Code § 17200, et seq. |

Plaintiff Isabel Pang ("Plaintiff") hereby brings this class action on behalf of herself, and all others similarly situated, against Defendants General Motors, LLC, Inc. ("GM" or "Defendant") and Does 1 to 10. This action is based on personal knowledge relating to Plaintiff's own actions, and on information and belief based on the investigation of counsel.

## INTRODUCTORY ALLEGATIONS

1. This matter arises from Defendant GM's unlawful failure to tender a regulatory compliant emissions warranty for the vehicles that GM distributes in the

State of California. At all times herein relevant, these vehicles are distributed under the brand names of Chevrolet, Buick, GMC and Cadillac.

2.    In an effort by GM to minimize its warranty exposure, GM has unilaterally and unlawfully limited the parts that are covered under GM's application of the California Emissions Warranty, and when these parts are defective, instead of covering the parts and related repairs under the California Emissions Warranty, GM refuses to cover the parts under the California Emissions Warranty, harming its customers.  This action focuses specifically, but not exclusively, on camshaft covers.

3.    In 1990, the California Air Resource Board ("CARB") submitted, and the State Legislature adopted, California Code of Regulation §§ 2035, *et seq.*, which, amongst other things, requires all vehicle manufacturers to ensure that any new motor vehicle sold in California is accompanied by a "regulatory compliant" general emissions warranty.

4.    In order to be "regulatory compliant," the emissions warranty must provide coverage for defects "which cause the failure of a warranted part [or] which would cause the vehicle's on-board diagnostic malfunction indicator light to illuminate, for a period of three (3) years or 50,000 miles, whichever occurs first[.]" [13 CCR § 2037(b)(2)]. The on-board diagnostic malfunction indicator light is commonly referred to as the, "check engine light."

5.    A "warranted part" is defined as any part installed by a manufacturer "which affects any regulated emission from a motor vehicle or engine[.]" [13 CCR § 2035(c)(2)(B)]. 8. When the part is considered to be a "high-priced" warranted part, the manufacturer must extend the emissions warranty from three years/50,000-miles, to 7-years or 70,000-miles. [13 CCR § 2037(b)(3)].

6.    This case involves GM failing to provide owners and lessees of GM vehicles with a California Emissions Warranty which complies with GM's warranty obligations as mandated by the California Code of Regulations.

7.    Camshaft covers are designed to protect the engine camshafts, the

-2-
COMPLAINT

engine valvetrain and the engine oil from dirt, debris, and moisture, while also providing an access point to the camshaft and valvetrain for assembly, service and repair. Some GM vehicles are equipped with camshaft covers that also serve an integral function relating to the positive crankcase ventilation system ("PCV"). The camshaft covers that serve an integral function in the PCV are referred to as "CAMSHAFT COVERS."

8. The PCV is an emissions related system which reduces emissions. When CAMSHAFT COVERS fail, there is a loss of vacuum in the PCV system, which increases emissions and causes the check engine light to illuminate.

9. This case relates to all GM vehicles which are equipped with CAMSHAFT COVERS that are not covered for 7 years or 70,000 miles under the GM California Emissions Warranty ("CLASS VEHICLES").

10. As alleged in greater detail below, not only is the CAMSHAFT COVER "warranted parts," but it is a "high-priced" warranted part whose repair or replacement is covered under the California emissions warranty for 7 years or 70,000 miles.

11. Yet, in an effort to minimize its warranty costs, GM has unilaterally, wrongfully, and unlawfully excluded many parts, including but not limited to CAMSHAFT COVERS, from being covered under GM's emissions warranty as "emissions-related" parts, "warranted parts" and "high-priced" warranted parts. On information and belief, GM has never treated the CAMSHAFT COVERS installed in the CLASS VEHICLES as being "emissions-related" parts and has never treated the CAMSHAFT COVERS installed in the CLASS VEHICLES as "warranted parts". As a result, Class Members, including Plaintiff, have wrongfully been denied warranty coverage.

12. As a result of GM's systematic refusal to provide the proper emissions warranty coverage, GM has wrongfully required Plaintiff Isabel Pang, and on information and belief at least several hundred other Class Members, to pay out-of-

-3-
COMPLAINT

pocket for repairs which should have been conducted free of charge under California's 7-years or 70,000-miles emissions warranty.

13. Further, as alleged below, by failing to cover CAMSHAFT COVERS under the California Emissions Warranty, GM also failed to provide a fully complaint California Emissions Warranty for all CLASS VEHICLES at the time of sale, resulting in Class members overpaying for their vehicles and paying out of pocket for repairs that should have been covered under the California Emissions Warranty.

14. Plaintiff, on behalf of herself and all others similarly situated, seeks redress for GM's violations of California law based on the causes of action set forth below. In addition, Plaintiff seeks an order, *inter alia*, enjoining GM's conduct; directing it to inform Class Members that repair and/or replacement of CAMSHAFT COVERS are covered under the 7-years or 70,000-miles emissions warranty; directing GM to provide warranty coverage for the repair and replacement of defective Class Vehicle CAMSHAFT COVERS during the first 7-years or 70,000 miles of vehicle service; and for restitution relating to GM's failure to provide a compliant California Emissions Warranty.

## PARTIES

15. Plaintiff Isabel Pangis a resident of Los Angeles County and was at all times relevant residing therein. Plaintiff is the owner of a CLASS VEHICLE, specifically, a 2017 Chevrolet Malibu VIN #1G1ZJ5SU3HF283030 (the "Subject Vehicle") equipped with a CAMSHAFT COVER.

16. Defendant GM is a limited liability company with its principal place of business located in Detroit, Michigan.

17. All acts and omissions of GM's employees, agents, associates, partners, parents, or subsidiaries as alleged herein occurred while they were acting within the course and scope of their duties and GM is therefore responsible to Plaintiff under the doctrine of Respondeat Superior and/or other doctrines.

18. Plaintiff is unaware of the true names or capacities of the Defendants sued herein as Does 1 through 10, ("Doe Defendants"), and therefore sues said Doe Defendants by such fictitious names. Plaintiff will amend this Complaint to insert the true names and capacities of such Doe Defendants when such information has been obtained. Plaintiff is informed and believes, and based on such information and belief alleges, that each of the fictitiously named Doe Defendants participated in some way in the wrongful acts and omissions alleged herein.

## JURISDICTION AND VENUE

19. Pursuant to Local Rule 8-1, the court has jurisdiction under the Class Action Fairness Act, 28 USC § 1332(d); Plaintiff is a resident of California and Defendant's principal place of business is in Michigan. The court also has supplemental jurisdiction over the state law claim pursuant to 28 USC § 1367.

20. Venue is proper in the Central District pursuant to 28 USC § 1391 since Plaintiff purchase the Subject Vehicle at OC Auto Exchange in Fullerton.

## BACKGROUND ALLEGATIONS

21. To understand the widespread effect of GM's unlawful conduct as alleged, it is important to identify the statutory provisions at issue.

22. In September 1990, and pursuant to its broad authority to regulate and reduce vehicle emissions under Health and Safety Code §§ 43013(a) and 43205, CARB submitted, and the Legislature adopted, California Code of Regulations ("CCR") §§ 2035, *et seq*., otherwise known as the "Emission Control System Warranty Requirements for 1990 and Subsequent Model Year Passenger Cars, Light-Trucks, and Medium-Duty Vehicles."

23. The Regulations require manufacturers to provide warranty coverage for defects relating to "warranted parts." As defined by the Regulations, a "warranted part" includes any part whose malfunction is required to, or can, cause the vehicle's Malfunction Indicator Light ("MIL") to illuminate—even though the primary function of the defective component is not directly related to emissions control. [13

-5-

CCR § 2035(c)(2)(B)].

24. The MIL is a light located on the driver's side instrument panel that, when illuminated, is amber in color and displays either a "Check Engine" or "Check Powertrain" message; a "Service Engine soon" or "Service Powertrain Soon" message; or the International Standards Organization "engine symbol."

25. The MIL illuminates to notify the driver of a defect identified by the vehicle's on-board diagnostic emission systems. In layman's terms, this means that when the MIL is illuminated, an emissions-related defect has been detected in the vehicle. The MIL is commonly referred to as the "check engine light."

26. One specific type of "warranted part" is an emissions-related part. An "emissions-related part" is defined in 13 CCR § 1900(b)(3) as any automotive part which affects any regulated emission from a motor vehicle which is subject to California or federal emission standards. This includes, at a minimum, those parts identified in the "Emissions-Related Parts List," adopted by CARB on November 4, 1977, as last amended June 1, 1990.

27. Any defect which "cause[s] the failure of a warranted part [or] which would cause the vehicle's on-board diagnostic malfunction indicator light to illuminate" is entitled, by statute, to warranty coverage "for a period of -years or 50,000 miles, whichever occurs first[.]" [13 CCR § 2037(b)(2)].

28. As alleged above, repair or replacement of any emissions-related components are generally covered by a California statutory 3 years or 50,000 miles emission warranty. However, if these emissions-related parts are determined to be "high-priced," then 13 CCR § 2037(c)(3) requires that the warranty coverage be extended from 3 years or 50,000 miles, to 7 years/70,000 miles.

29. A "high-priced warranted part" is defined as a warranted part whose individual replacement cost at the time of certification exceeds the cost limit established by a mathematical calculation using as a variable the annual average nationwide urban Consumer Price Index ("CPI") for the calendar year two years

-6-
COMPLAINT

prior to the model-year for which the cost limit is being calculated. [13 CCR § 2037(c)(3)].

30.    In calculating whether a particular part's individual replacement cost at the time of certification exceeds the cost limit, "the replacement cost shall be the retail cost to a vehicle owner and include the cost of the part, labor, and standard diagnosis." [13 CCR § 2037(c)(1)]. This calculation must utilize a price-point as would be charged "in the highest-cost metropolitan area of California." [13 CCR § 2037(c)(2)]

31.    This cost limit shall be calculated using the following equation:

$$\text{Cost limit}_n = \$300 \times (CPI_{n-2} / 118.3)$$

32.    Cost limit$_n$ is the cost limit for the applicable model year of the vehicle rounded to the nearest ten dollars.

33.    If, upon conducting this calculation, the price of replacement exceeds the CPI cost limit, the part is a "high-priced" warranted part, and the manufacturer is statutorily required to extend warranty coverage for the part's repair or replacement from three years/50,000 miles, to seven years/70,000 miles. [13 CCR § 2037(b)(3)].

34.    There has never been a year where the cost limit for the Class Vehicles has been greater than $1,000.00. Additionally, when using the methodology required by the California Code of Regulations to calculate the cost of CAMSHAFT COVER replacement due to a defect which causes the Class Vehicles to malfunction in a manner which increases regulated emissions and illuminates the MIL, the cost is always *greater* than $1,000.00. The replacement cost of the CAMSHAFT COVER has always exceeded $1,000.00. Indeed, the replacement cost for the CAMSHAFT COVER part in 2018 was more than $1,000.00, as evidenced by the fact that in June of 2023, the cost to replace the camshaft cover in Plaintiff's vehicle was $2,044.67, plus tax.  Thus, the cost of CAMSHAFT COVER replacements to CLASS VEHICLES has always exceeded the cost limit during the Class period.

35.    At all times relevant, for each new motor vehicle intended to be

distributed by GM in the State of California, at the time of distribution, GM has purported to accurately notify CARB of the parts which should be covered as emissions-related parts, also known as "warranted parts."

36. Furthermore, for each new motor vehicle intended to be distributed by GM in the State of California, at the time of distribution, GM has purported to accurately notify CARB of the parts which should be covered under the California Emissions Warranty.

37. For each new vehicle intended to be distributed by GM in the State of California, at the time of distribution, GM has purported to provide accurate written warranty documents accompanying the sale of its vehicles—including that these warranty documents accurately identified all of the vehicle's parts that are covered under the California Emissions Warranty.

38. GM has engaged in a systematic business practice where, at the time of sale of its motor vehicles and thereafter, it omitted from its warranty booklets, and in resources provided to its dealerships, the CAMSHAFT COVER in Class Vehicles, which should have been identified as emissions-related, high priced warranty parts covered under the California Emissions Warranty.

39. GM does properly classify *some* of its parts as being covered under the California Emissions Warranty, but it does not *fully and comprehensively disclose* or classify *all of* the parts which are entitled to this statutory coverage, including the CAMSHAFT COVER in Class Vehicles. Consequently, when Class Members present their GM vehicles for repair at an authorized repair facility, GM fails to provide coverage under the California Emissions Warranty for repairs to the CAMSHAFT COVER, which should have been covered under the California Emissions Warranty.

40. Class Members have thus been forced to pay out-of-pocket for repairs to the CAMSHAFT COVERS in Class Vehicles which, by operation of law, should have properly been paid for by GM.

41.     GM engages in this misconduct in order to reduce the amount of money that it has to pay out on warranty-related repairs and warranty claims.

42.     If GM had simply identified all the warranted parts and high-priced warranted parts that should be correctly identified as such, then GM dealerships would have unquestionably conducted repairs for these parts under warranty, and Plaintiff and other California Class Members would never have been injured.

43.     GM's failure and refusal to properly identify the parts which should have been classified as warranted parts and "high-priced" warranted parts, including the CAMSHAFT COVER, is a clear violation of California Business and Professions Code section 17200, et seq. (the "UCL") and is intended to minimize the amount of money that GM has to pay out in warranty claims.

44.     Plaintiff and other Class Members have suffered damage and lost money or property as a result of GM's wrongful conduct, and GM has been unjustly enriched.

### ALLEGATIONS RELATED TO PLAINTIFF

45.     On June 16, 2022, Plaintiff purchased a used 2017 Chevrolet Malibu (the "Subject Vehicle").  It is Plaintiff's information and belief that the Subject Vehicle was originally placed into service in September of 2017.

46.     At the time Plaintiff purchased the Subject Vehicle, it was accompanied by coverage pursuant to the California Emissions Warranty.

47.     On June 10, 2023, at 47,188 miles, prior to the Subject Vehicle being driven 70,000 miles or having been placed into service for more than 7 years, Plaintiff brought the Subject Vehicle to Chevrolet Montebello, located at 310 West Whittier Boulevard, Montebello California 90640 ("Chevy Montbello") because the check engine light was illuminated. Chevy Montebello is a GM factory authorized repair facility and is one of the locations where Class Members are supposed to take their vehicles for repairs covered by the GM warranty. Chevy Montebello is located in the count of Los Angeles, California.

48.     Chevy Montebello performed an inspection and found that the PCV system was malfunctioning, leaking vacuum externally, causing the engine to run rough and setting fault codes. Additionally, the CAMSHAFT COVER assembly was determined to be defective, causing the PCV system malfunction, related problems and causing the check engine light to illuminate. The CAMSHAFT COVER was replaced. Chevy Montebello denied coverage and as a result, Plaintiff paid $2,044.67, plus tax, for the repairs. Although the warranty does cover some PCV components, it does not cover the CAMSHAFT COVER. For the reasons already stated herein, the CAMSHAFT COVER should be covered under the California Emissions Warranty.

49.     The entire cost of the diagnosis and repairs relating to the CAMSHAFT COVER should have been covered and paid for by GM under the 7 years or 70,000 miles California Emissions Warranty. This is because, pursuant to 13 CCR § 2037(c), the CAMSHAFT COVER should have been identified as a high-priced emissions-related part, and the parts relating to that repair should have been covered under the California Emissions Warranty pursuant to under section 2037(c).

50.     Defendant breached its obligations under the California Emissions Warranty at Chevy Montebello on June 10, 2023, by failing to cover the CAMSHAFT COVER.

51.     Plaintiff is informed and believes, and based on such information and belief alleges, that GM's failure to classify the CAMSHAFT COVER as a covered part under the California Emissions Warranty was an omission by GM designed to limit its warranty exposure.

52.     Plaintiff is informed and believes, and based on such information and belief alleges, that Plaintiff's experience is just one of many examples of GM's scheme to avoid providing a true and comprehensive list of all parts which should be covered under either a 3-year or 50,000-mile, or 7-year or 70,000-mile California Emission Warranty.

53. The details of how GM actually applied the CCR and the CCR cost limit formula with respect to the CAMSHAFT COVER are exclusively within GM's possession— as is the information regarding what other parts GM improperly omitted from its list of parts entitled to coverage under the California Emissions Warranty.

54. In this case, Plaintiff presented the Subject Vehicle to a GM authorized repair facility for repairs prior to the end of the 7 years or 70,000 miles California Emissions Warranty period for high-priced emissions parts. Instead of conducting these repairs under warranty as required by California law, GM unlawfully denied warranty coverage for the CAMSHAFT COVER—a "high-priced" emission part which should have been covered under the 7 years or 70,000 miles California Emissions Warranty.

55. The reason that Plaintiff was charged for said repairs was not the result of an individual oversight by Chevy Montebello in failing to identify the repairs as being covered under the 7 years or 70,000 miles California Emissions Warranty. Instead, Plaintiff was denied warranty coverage because GM, in a systematic and organized attempt to increase profit, omitted from warranty booklets and internal dealership literature, those parts which should have been identified as "emissions-related", "warranted parts" and as "high-priced" warranted parts entitled to extended statutory coverage.

56. Pursuant to 13 CCR § 2037(c)(1)(B), GM is required by law to identify "high-priced warranted parts…which have an individual replacement cost at the time of certification exceeding the cost limit defined in section (c)(3)."

57. GM intentionally failed to identify all said components, including the CAMSHAFT COVER, in order to increase profit vis-à-vis reducing the amount of money it spends on warranty-related repairs.

58. If GM complied with California law and properly identified all the parts which should have been identified as "high-priced," then GM dealerships would

-11-
COMPLAINT

properly provide warranty coverage for said high-priced warranted parts, and Plaintiff would never have paid out-of-pocket for repairs which were covered under warranty.

59.    In addition, GM's failure to provide a comprehensive California Emissions Warranty that covered the CAMSHAFT COVER resulted in Plaintiff and the Class overpaying for their vehicles. In essence, Class members paid for vehicles that purported to cover all required parts, including the CAMSHAFT COVER, pursuant to the California Emissions Warranty, but did not. GM's refusal to include in its written warranty booklets coverage for the CAMSHAFT COVER in CLASS VEHICLES under the California Emissions Warranty resulted in GM's unjust enrichment and detriment to Plaintiff and the Class. This is because Class Members were supposed to be provided with warranty coverage which complied with GM's California Emissions Warranty obligations.

60.    A compliant warranty has a value to Class Members and has a cost to GM. Instead of GM providing a compliant warranty, GM has provided a deficient warranty which does not cover the CAMSHAFT COVER under the California Emissions Warranty, which GM is lawfully obligated to cover. The non-compliant warranty has a value to Class Members, which is less than the compliant warranty, because the non-compliant warranty provides less coverage and thus exposes Class Members to more financial risk and is less valuable to Class Members. Similarly, the non-compliant warranty costs GM less money, because it exposes GM to less risk and will result in GM paying out less in warranty claims.

61.    Class Members were entitled to a compliant California Emissions Warranty but were provided with a deficient warranty. As a result, GM has been unjustly enriched by providing a deficient warranty which reduced GM's costs, and Class Members have been injured by not receiving the warranty that they were legally entitled to receive.

62.    GM's conduct violates California Business and Professions Code

-12-
COMPLAINT

section 17200, et seq. (the "UCL"). Plaintiff and other members of the Class have suffered damage as a result of GM's wrongful conduct as alleged herein.

63. Plaintiff's theory does not depend on the premise that CARB was deceived by the information that GM submitted, and Plaintiff is not accusing CARB of mismanagement or blaming CARB for GM's inaccuracy. GM alone is responsible for selecting and identifying to CARB the parts that GM has unilaterally identified as warranted parts and "high-cost emissions warranty parts" as a prerequisite to its application for vehicle certification.

**THE CAMSHAFT COVER IS A HIGH-PRICED WARRANTED PART**

64. In order to establish that the CAMSHAFT COVER should be designated as a "high-priced" warranted part, Plaintiff must first establish that the part is "emissions-related."

65. The evidence is incontrovertible that the CAMSHAFT COVER is an emissions-related component. The CAMSHAFT COVER is a "warranted part" because it satisfies any and all of the regulatory prerequisites in that a defect or failure in the CAMSHAFT COVER will cause the "check engine" light to illuminate; will cause an increase in "regulated" emissions; and will cause the vehicle to fail a smog check. As alleged herein, the CAMSHAFT COVER should have been classified as a high-priced emissions part entitled to warranty coverage for 7 years or 70,000 miles.

66. On June 1, 1990, CARB published a document entitled "Emission-Related Parts List." The document states, "The following list of components are examples of emission related parts as defined in Section 1900 (b) (3), Chapter 3, Title 13, California Code of Regulations." Section III(B)(1) of that list identifies the CAMSHAFT COVER as being an emissions-related part.

67. The foregoing also is consistent with CARB's interpretation of the Regulations. CARB has provided a Declaration dated July 6, 2021 from Allen Lyons, who, at the time the declaration was made, was the Chief of the Emissions

-13-

Certification and Compliance Division of CARB, regarding the California Emissions Warranty (the "CARB Declaration") "for the sole purpose of educating the Courts about CARB's interpretation and implementation of California's warranty requirements." The CARB Declaration sets forth CARB's interpretation of certain of the foregoing CCR provisions, including how to define a "warranted part" for purposes of the California Emissions Warranty and how to properly determine whether an emissions part is also a "high-priced emissions part" entitled to extended warranty coverage for 7 years and 70,000 miles.

68.     The CARB Declaration states, in relevant part, that "warranted parts" under the California Emissions Warranty "include any components that can or are required to illuminate the OBD Malfunction Indicator Light (MIL) in the event of a malfunction, even if the primary function of the component is not emission control, within the warranty period. (Cal. Code Regs., tit. 13, § 2037, subd. (b)(2).) The MIL is a light located on the driver's side instrument panel that, when illuminated, is amber in color and displays "Check Engine/Powertrain," "Service Engine/Powertrain Soon," or the International Standards Organization (ISO) engine symbol; the MIL illuminates to notify the driver of detected malfunctions of OBD-monitored emissions systems on the vehicle. (Cal. Code Regs., tit. 13, § 1968.2, subds. (a), (d)(2.1.1) & (2.2.).)"

69.     The CARB Declaration further provides that "When calculating the cost of labor portion of the replacement cost equation, in order to determine if a part is a "high-priced" warranted part for the purposes of California Code of Regulations, title 13, section 2037, subdivision (c), manufacturers first calculate the amount of time it would take to diagnose and repair or replace the part (the labor hours). A dollar amount is then attributed to the number of labor hours to come up with a cost of labor for each part. In doing this, manufacturers should use the labor hours and associated costs that would be charged to consumers to perform any required diagnosis and repairs to or replacement of the part, not the labor hours that

manufacturers' service dealerships are allowed to charge manufacturers."

70. Based on the CARB Declaration, GM is required to provide coverage for all components whose failure: (1) affects any regulated emission from a motor vehicle; and (2) can or are required to illuminate the MIL, even if the primary function of the component is not emissions control. The California Code of Regulations mandates that the purpose of the MIL is to notify the driver of defective malfunctions of the OBDII monitored emissions systems of the vehicle; and/or failures which will cause a vehicle to fail a smog test as mandated by the California Health and Safety Code.

71. The CARB Declaration also repudiates any potential contention by GM that to be considered an "emission-related" component under the California Emissions Warranty, the component must be part of the "emissions control system."

72. As alleged herein, GM has systemically failed to follow the foregoing methodology.

73. A defect in the CAMSHAFT COVER "affects regulated emission" under the Regulations since the CAMSHAFT COVER is an emissions-related component and is part of the positive crankcase ventilation system. The positive crankcase ventilation system is a system specifically designed to reduce emissions. In fact, the only reason that the positive crankcase ventilation system is installed in the class vehicles is to reduce emissions.

74. Further, a defect in the CAMSHAFT COVER causes the MIL to illuminate. GM has the ability to determine what component failures result in the MIL illuminating, as described below. Furthermore, California Code of Regulations Section 1968.2 specifically mandates that the MIL should not illuminate unless there is an emissions-related defect, and the regulations mandate that if a component's failure can or does cause the MIL to illuminate, coverage under the California Emissions Warranty follows. Yet, GM does not provide the required coverage.

75. Further, the presence of specific fault codes further confirms that a

-15-

defect in the CAMSHAFT COVER is emissions-related. On information and belief, GM's own documents, including specifically the "OBD2 Summaries" submitted to CARB as part of the vehicle certification process, identify the fault codes that directly correlate with increased regulated emissions and confirm an emissions-related defect. Also, as confirmed by the OBD2 Summaries, these fault codes cause the OBDII MIL to be illuminated. The fault codes identified in the OBD2 Summaries confirm that there is a defect relating to an emissions related part.

76. Specifically, all the Class Vehicles are equipped with an OBDII onboard diagnostic system. The system uses sensors to gather data which is evaluated using OBDII fault code logic. If the OBDII logic determines that the data is outside of an acceptable range, a fault code is triggered, identifying a defect which increases regulated emissions. When GM seeks certification of vehicles for distribution in California, it is required, pursuant to 13 CCR 1968.2, to provide CARB with all of GM's OBDII fault codes and the corresponding logic. Accordingly, when a part that is or should be covered under the California Emissions Warranty fails, triggering an OBD2 fault code, it fails to perform as described in the vehicle's application for certification. The fault codes for GM vehicles are identified as "OBD2 Summary Tables" or similar document. GM submitted OBD2 Summary Tables or similar documents to CARB for every Class Vehicle and for every model year that the vehicles were certified for sale in California and that are at issue in this case.

77. The OBD2 Summary Tables identify the Components/Systems monitored by OBDII, the acceptable ranges relating to the data gathered, the corresponding emissions fault codes and that the MIL will be triggered when a defect is identified. The purpose of the OBDII system, as confirmed in the CCR, is specifically to monitor emissions-related components. This is why GM is required to develop a compliant OBDII system which identifies emissions related defects, triggering a fault code and a MIL. The fault codes are used to assist technicians in repairing the vehicles, whereas the MIL is used to alert the driver of a defect. This

-16-

COMPLAINT

means that every defect that triggers the emissions fault codes identified by GM in the OBD2 Summary Tables and the MIL is, by definition, an emissions-related defect. The OBD2 Summaries, among other documents, identify the parts that have not already been identified as emissions-related parts by GM in its warranty books but which, when defective, can or do trigger an emissions fault code and result in illumination of the MIL.

78. On information, the CAMSHAFT COVER defect alleged herein triggered a fault code on the OBDII Summaries, further confirming that the defect is emissions-related.

79. Therefore, GM is required to cover under the California Emissions Warranty the CAMSHAFT COVER and any defect that triggers a fault code identified by GM in its OBD2 Summaries submitted to CARB or that should properly be identified on the OBD2 Summaries, because such a defect affects regulated emissions.

80. The foregoing framework and analysis addresses and precludes any potential "slippery slope" argument or concern that every vehicle part could potentially be "emissions-related." This litigation is not dependent on the assertion that "emissions-related parts" are defined as every part in the OBDII system. Rather, this litigation asserts that, in addition to the CAMSHAFT COVER, there should be California Emissions Warranty coverage, at the very least, for the parts whose defects trigger fault codes identified on the OBD2 Summary Tables and cause the MIL to be illuminated as set forth in the OBD2 Summaries. This is because said parts undeniably are "emissions-related" and fail in a manner that increases regulated emissions. GM knows which fault codes these are because GM is required to provide to CARB all the fault codes that trigger a MIL and the specific emissions-related conditions that trigger the fault codes as set forth in the OBD2 Summaries. Further, as confirmed in the CARB Declaration, emissions-related parts include any components that "can" or are required to illuminate the MIL in the event of a

-17-
COMPLAINT

malfunction, even if the primary function of the component is not emissions control.

81.	Accordingly, to address emissions-related coverage issues with respect to all emissions-related fault codes in the Class Vehicles at issue in this action and as currently identified by GM in the OBD2 Summaries that GM provided to CARB, GM is required to cover, under the California Emissions Warranty, any defects that trigger a fault code identified by GM in the OBD2 Summary Tables for each Class Vehicle.

82.	GM also has failed to properly identify the CAMSHAFT COVER in Class vehicles as a "high-priced" emissions part.

83.	As part of the certification process for a vehicle, the manufacturer identifies which parts it considers to be "emissions parts" and submits a list of those parts to CARB. Section 2037(c). At the same time, the manufacturer also identifies the parts from the emissions parts list that the manufacturer has determined, based on the cost calculation set forth in the CCR, exceeds the cost limit and therefore are "high-priced" parts entitled to extended 7- year/70,000-mile coverage.

84.	California Code of Regulations Section 2037(c)(1) states, in relevant part, that in calculating whether an individual replacement cost at the time of certification exceeds the cost limit, "the replacement cost shall be the retail cost to a vehicle owner and include the cost of the part, labor, and standard diagnosis." Similarly, Section 2037(c)(2) states that "the replacement cost shall be the retail cost to a vehicle owner and include the cost of the part, labor, and standard diagnosis."

85.	On information and belief, GM does not use, and has never used, the retail labor cost i.e., the number of labor hours that the customer pays for the repair ("customer pay"). Instead, GM incorrectly uses the number of hours that the manufacturer pays its dealers to perform the repairs under warranty ("warranty pay"). GM is using the wrong standard and, in so doing, is failing to the comply with the express terms of the CCR and has miscalculated the high-price calculation.

86.	On March 15, 2016, CARB published Manufacturer's Advisory

Correspondence 2017-03 ("MAC 2017). The subject of MAC 2016 was entitled "Cost Limit for High-Priced Warranted Parts for New 2017 Model-Year (MY) Passenger Cars (PC), Light-Duty Trucks (LDT), Medium-Duty Vehicles and Engines Used in These Vehicles."

87.    Relevant here is that MAC 2017 "identifies the cost limit for high-priced warranted parts of MY2017 [passenger cars]." Because Class Vehicles are passenger cars, MAC 2017 establishes the cost limit for high-priced warranted parts for the Subject Vehicle, and all Class Vehicles, is $600.00.

88.    Pursuant to 13 CCR §2037(c) or §2435(b), as applicable, the cost limit for high-priced warranted parts for model year 2018 passenger cars is calculated using the annual average nationwide urban consumer price index (CPI) for 2016—the calendar year two years prior to the model-year for which the cost limit is being calculated. This CPI is published by the U.S. Bureau of Labor Statistics. When rounded to the nearest ten dollars, the model year 2018 cost limit is $610.00, as calculated below:

$$\text{MY2017 Cost Limit} = \$300 \times (\text{calendar 2015 CPI/baseline CPI})$$
$$= \$300 \times (237.0/118.3)$$
$$= \$600.00$$

89.    The $600.00 cost limit accounts for the total cost to diagnose and replace a warranted part. When the cost to diagnose and replace a warranted part exceeds $600.00, then the warranted part's replacement, by operation of law, must be provided warranty coverage for 7-years or 70,000-miless—whichever occurs first.

90.    Further, under a section entitled "High-Priced Warranted Parts Cost Documentation in the Applications for Certification" the MAC makes explicit that "[m]anufacturers must submit in their applications for certification the documentation used to identify the high-priced warranted parts in accordance with 13 CCR §2037(c)(3), §2435(b)…[T]he documentation shall include all emission-related parts costing more than $500…(i.e., calculated cost limit minus $100) to

replace…This documentation shall substantiate that the list includes all potential high-priced parts. The documentation shall include the estimated retail parts costs, labor rates in dollars per hour, and the labor hours necessary to replace the parts including standard diagnosis. If the labor hours being charged for customer-pay repairs are different from those specified by the manufacturer for warranty repairs, the manufacturer shall substantiate the labor hours specified. All applications and required documentation (i.e., high-priced warranted parts list, potential high-priced parts, and cost calculations) must be submitted using the California Air Resources Board's (CARB) Document Management System."

91.    In this case, the replacement cost of the CAMSHAFT COVER—which includes parts and labor—exceeded the applicable cost limit of $600.00 because the replacement cost for the CAMSHAFT COVER and related repairs needed due to the failed CAMSHAFT COVER was $2,044.67, plus tax as of June 2023. Plaintiff alleges that in 2017, the cost of said repair exceeded the high cost threshold.

92.    In fact, Plaintiff contends on information and belief that there has never been a year during the class period where the cost limit has been greater than $1,000.00 and the replacement cost for the CAMSHAFT COVER in any of the Class Vehicles has never been less than $1,000. When using the methodology required by the California Code of Regulations to calculate the cost of CAMSHAFT COVER replacement due to a defect which causes the Class Vehicle to malfunction and the MIL to illuminate, the cost is always greater than $1,000.00. Thus, the cost of CAMSHAFT COVER replacements to Class Vehicles needed due to defects which causes Class Vehicle to malfunction always exceed the cost limit.

93.    Further, as alleged herein, GM has failed, and continues to fail, on a systemic basis and as a matter of GM policy, to perform the proper calculation to determine if emissions-related parts are also "high-priced" parts entitled to be covered under the California Emissions Warranty for 7-years/70,000-miles. Because this misconduct is systemic, it is not limited to the CAMSHAFT COVER and applies

to all emissions-related parts in all GM vehicles, as alleged herein.

94.    It is alleged on information and belief that GM uses the number of hours that the manufacturer pays its dealers to perform the repairs under warranty ("warranty pay" or "flat rate"). However, by law, and as confirmed in the CARB Declaration, the proper standard is to use the labor hours and associated costs that would be charged to consumers ("customer pay") to perform any required diagnosis and repairs to or replacement of the part, not the labor hours that manufacturers' service dealerships are allowed to charge manufacturers. By failing to use the proper standard, GM has failed, as a uniform practice, to identify all parts that should properly be identified as high-priced parts entitled to extended warranty coverage under the California Emissions Warranty.

95.    California Code of Regulations Section 2037(c)(1) states, in relevant part, that in calculating whether an individual replacement cost at the time of certification exceeds the cost limit, "the replacement cost shall be the retail cost to a vehicle owner and include the cost of the part, labor, and standard diagnosis." Emphasis added. Similarly, Section 2037(c)(2) states that "the replacement cost shall be the retail cost to a vehicle owner and include the cost of the part, labor, and standard diagnosis." Emphasis added. As set forth above, the CARB Declaration further confirms that manufacturers should use the labor hours and associated costs that would be charged to consumers to perform any required diagnosis and repairs to or replacement of the part, not the labor hours that manufacturers' service dealerships are allowed to charge manufacturers.

96.    By failing to provide a 7-years or 70,000-miles warranty for the CAMSHAFT COVER, GM violated the UCL.

97.    Accordingly, with regard to the determination of whether a part is "high-priced," Plaintiff seeks an order, among other things, (1) compelling GM to cease its current practice of using the warranty pay rate and instead use an analysis consisting of many labor hours a customer would be charged for a repair, for the

-21-

purpose of determining whether a part is high-priced under the California Emissions Warranty; and, (2) with regard to all vehicles distributed by GM, requiring GM to recalculate the cost of all parts that GM previously identified and submitted to CARB as being "emissions parts" and that, in fact, should also properly be characterized as "high-priced" parts covered under the California Emissions Warranty when the correct, customer pay rate is used; and, (3) requiring GM to reimburse GM vehicle owners and lessees for all out of pocket expenses wrongfully paid for repairs that should properly have been covered by GM under the California Emissions Warranty

**ADDITIONAL ALLEGATIONS REGARDING EQUITABLE RELIEF**

**Plaintiff is Entitled to Equitable Relief**

98.     Plaintiff alleges a UCL claim only, and the remedies under the UCL are limited to restitution and injunctive relief and do not include damages. Plaintiff does not allege a claim that provides for damages and does not seek damages.

99.     Equitable relief is necessary and appropriate because the harm suffered by Plaintiff and members of the Class and perpetrated by Defendant is not adequately compensable with damages, and damages are not fully adequate to make Plaintiff and the Class whole.

100.    Damages are inadequate to compensate for the harms caused to Plaintiff and the Class due to Defendant's violation, and continuing violation, of the California Emissions Warranty.  The entire purpose of the California Emissions Warranty is to protect the environment. The California Emissions Warranty was enacted by the State of California to restrict harmful greenhouse gas emissions from gasoline and hybrid gasoline engines. The fundamental purpose of the emissions requirements is to reduce emissions, limit fuel consumption and increase fuel efficiency, by forcing manufacturers to repair and/or replace failed emissions-related vehicle components under warranty, thereby decreasing greenhouse gas emissions, including carbon dioxide emissions.

101.    Indeed, motor vehicle use is the single greatest source of U.S. air

-22-
COMPLAINT

pollution and is the cause of more air pollution than any other human activity. (Cars, Fuels, and Clean Air: A Review of Title II of the Clean Air Act Amendments of 1990 (1991) 21 Envtl. L. 1947, 1949). Many of these pollutants consist of hydrocarbons and nitrous oxides which react to form photochemical oxidants in the atmosphere. The most notorious of these photochemical oxidants is ozone – the primary component of urban smog. (California Air Resources Bd., Staff Report: Proposed Regulations for Low-Emission Vehicles and Clean Fuels (Aug. 13, 1990) at p. 3). Cars also produce nearly two-thirds of all carbon dioxide emissions. Carbon dioxide content in the atmosphere is closely linked to global temperature because the temperature of the Earth is primarily determined by the balance between its absorption of energy from the Sun, and the reflection of a portion of this energy back into space. Carbon dioxide – a greenhouse gas – traps the energy and heat which would have otherwise escaped back into space, and re-emits it, causing the warming of our atmosphere. This process is known as the "greenhouse effect."

102.  Therefore, the State of California highly regulates emissions from gasoline and hybrid gasoline engines, specifically greenhouse gas emissions. In September 1990, pursuant to its broad authority to regulate and reduce environmentally harmful vehicle emissions under Health and Safety Code §§ 43013(a) and 43205, CARB submitted, and the Legislature adopted, California Code of Regulation §§ 2035, *et seq.*, which requires all manufacturers to provide a regulatory compliant emissions warranty to all vehicles distributed and registered in California.

103.  In September 2004, CARB approved the "Pavley" Greenhouse Gas Regulations to control greenhouse gas emissions from new LEV II vehicles beginning with the 2009 model year. These Greenhouse Gas Regulations added four greenhouse gas air contaminants to the vehicular criteria and toxic air contaminant emissions that California was already carbon dioxide ($CO_2$), methane ($CH_4$), nitrous oxide ($N_2O$), and hydrofluorocarbons (air conditioner refrigerants).

104. The State and federal government have specifically focused on regulating greenhouse gas emissions, including carbon dioxide emissions. If a gas vehicle has a defect which increases fuel consumption, that defect increases carbon dioxide emissions.

105. Notwithstanding State and federal regulations designed to protect our air, monitoring shows that over 90 percent of Californians breathe unhealthy levels of one or more air pollutants during some part of the year. Despite CARB's best efforts, in 2020, "there were 157 bad air days for ozone pollution—the invisible, lung-searing gas in smog—across the vast, coast-to-mountains basin spanning Los Angeles, Orange, Riverside and San Bernardino counties. That's the most days above the federal health standard since 1997." (Barboza, Tony (Dec. 6, 2020) L.A. Began 2020 With A Clean-Air Streak but Ended with Its Worst Smog in Decades, Los Angeles Times [https://www.latimes.com/42alifornia/story/2020-12-06/2020-laair-quality-southern-california-pollution-analysis].) One of the reasons that our environment is in such a state of crisis is that corporations are not following our very thoroughly formulated rules.

106. The environmental harm suffered by Plaintiff and the Class can never be fully remedied through damages, and monetary damages will not make Plaintiff or the putative Class whole. Money damages will not stop the environmental harm experienced by Plaintiff and the Class as a result of Defendant's violation of the emissions laws, which requires injunctive relief. Indeed, environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable.

107. Accordingly, this case is fundamentally different from other UCL cases involving defective products or false advertising. Here, money damages will not fix the environmental harm experienced by Plaintiff and the Class as a result due of Defendant's violation of the emissions laws, which requires equitable relief.

108. Further, GM and other car manufacturers should not be able to shirk

-24-

COMPLAINT

their legal responsibilities to Plaintiff and the Class simply by paying damages. Simply paying off consumers undermines the entire purpose of the California Emissions Warranty and will leave Defendant in the position of being able to continue to violate the law and increase harmful vehicle emissions by just paying damages. Ironically, this result will leave Plaintiff and members of the Class in an even worse position than by simply receiving monetary compensation alone.

109.   Further, as set forth below, the prospect of paying damages is insufficient to prevent Defendant from engaging, and continuing to engage, in the alleged unlaw conduct. Money damages are an inadequate remedy for future harm, as they will not prevent Defendant from continuing the alleged wrong practice. Damages for past conduct is not likely to dissuade Defendant from continuing its unlawful behavior in the future. Equitable relief in the form of an injunction is necessary to compel Defendant to comply with the Regulations.

110.   Further, equitable relief is required because damages alone will not be sufficient for Members of the Classes to identify all parts whose defects result in fault codes identified in the OBD2 Summaries being triggered. Only Defendant has done the analysis and knows the fault code logic that would allow for identification of all required fault codes to CARB and all parts that give rise to those fault codes so that those parts can be identified and properly covered under the California Emissions Warranty. In effect, Plaintiff's request for equitable relief is the only way to get Defendant to do what it is required to do.

111.   The CARB Declaration further supports Plaintiff's claim for equitable relief.  The CARB Declaration sets forth CARB's interpretation of certain of the foregoing CCR provisions and the standard to use in determining whether an emission-related part is also high-priced. Defendant has an obligation under the California Emissions Warranty to identify all emissions-related vehicle components for which there should be warranty coverage. As a custom and practice, Defendant has interpreted this obligation too narrowly, resulting in Defendant wrongfully

-25-
COMPLAINT

failing to identify vehicle components as emissions-related vehicle components under the California Emissions Warranty.

112.   Moreover, payment of damages does not ensure that the emissions parts will actually be repaired. That result will only be ensured by forcing Defendant to cover the repair under the California Emissions Warranty as required.

113.   Accordingly, the equitable relief requested would go beyond any damages remedy available to Plaintiff and the Class, and damages would not fully remedy the injury to Plaintiff and the Class.

### Plaintiff is Entitled to Restitution

114.   Plaintiff is entitled to restitution as an equitable remedy to recover out of pocket costs. Restitution is the only remedy provided by the UCL for recovering out of pocket costs, and Plaintiff does not allege another claim for which damages are provided.

115.   Further, restitution and damages are two distinct remedies that serve different purposes. The purpose of restitution is to restore Plaintiff and the Class to their pre-harm position by requiring Defendant to return money (in this case, out of pocket costs) that was taken or lost as a result of Defendant's actions. The purpose of damages, on the other hand, which is not sought here, is to compensate for the harm suffered. The recovery of out-of-pocket expenses is restitution, not damages.

116.   Restitution would be more certain, prompt or efficient than any legal remedy.  For example, under the UCL, Plaintiff may state a claim merely by showing that Defendant's practice violated the unfair or unlawful prongs of the UCL, as Plaintiff alleges here, without having to plead or prove any elements of fraud.

117.   Further, in UCL cases, restitution seeks to restore money (i.e., out of pocket costs) that was wrongfully obtained by Defendant. This amount can be calculated with relative certainty, making the amount of restitution more predictable than other types of relief, such as damages.

COMPLAINT

118.  Restitution also is more prompt than other legal remedies in this case because it would not require extensive legal proceedings or expert testimony. The Court could order restitution based on simple evidence of what was taken or lost, which can result in a faster resolution of the case.

119.  In addition, restitution is more efficient than other types of relief because it does not require ongoing Court supervision or enforcement. Once an order for restitution has been issued, Defendant is generally required to pay promptly or face additional legal consequences. This can make the process more efficient than other types of relief, such as an award of damages that may require ongoing monitoring and enforcement.

120.  Plaintiff's claim for monetary relief is secondary to Plaintiff's primary goal of obtaining declaratory relief and/or requiring Defendant to properly and fully comply with the California Emissions Warranty, as described herein.

### Plaintiff is Entitled to Injunctive Relief

121.  Plaintiff also is entitled to injunctive and/or declaratory relief as an equitable remedy. Plaintiff's primary goal on behalf of the Class is to obtain injunctive relief requiring GM to comply with the California Emissions Warranty and declaratory relief with respect to the proper interpretation of the California Emissions Warranty and GM's obligations pursuant to the CCRs and the California Emissions Warranty.  Even in the absence of possible monetary recovery, Plaintiff would bring this action to obtain the injunctive and declaratory relief sought.

122.  Plaintiff seeks an injunction and/or declaration that Defendant's ongoing and continuing practices as alleged herein do not comply with the CCRs and with the California Emissions Warranty laws and enjoining such practices, and that, *inter alia*: (1) the CAMSHAFT COVER in the Class Vehicles is an "emissions-related part" and/or high-priced" warranty part; and (2)  Defendant has used, and continues to use, the wrong or incorrect standards for identifying "emission-related" parts and "high-priced warranty parts" under the California Emissions Warranty.

123. The injunctive relief that Plaintiff requests is prospective in nature and is the only adequate remedy to prevent the future harm that will be caused by Defendant's continuation of the unfair and unlawful conduct alleged herein.

124. As set forth herein, the prospect of paying money is insufficient to prevent Defendant from engaging, and continuing to engage, in the alleged unlawful conduct. Money damages are an inadequate remedy for future harm, as they will not prevent Defendant from continuing the alleged wrongful practice. Restitution for past conduct is not likely to dissuade Defendant from continuing its unlawful behavior in the future. Moreover, payment of restitution does not ensure that the emissions parts will actually be repaired. That result will only be ensured by forcing Defendant to cover the repair under the California Emissions Warranty as required. Moreover, future money damages that may be suffered by the Plaintiff and other consumers cannot be proven with certainty.

125. Future injunctive relief is necessary because there is an imminent likelihood of future harm. As alleged above, the environmental harm caused by Defendant's misconduct is not only imminent but continuous and ongoing and will not change absent the requested injunctive relief, and damages will not prevent Defendant from continuing its alleged wrongful practices. An injunction will ensure that there are no future harms from ongoing and future violations and that Plaintiff and other consumers can rely on Defendant's adherence to the California Emissions Warranty law.

126. Further, there is a sufficient likelihood that Plaintiff and members of the Class will again be wronged in a similar way. To the extent that the alleged defect in the CAMSHAFT COVER is the result of a design related defect or a systemic defect in materials or workmanship, the defect will continue to manifest in all Class Vehicles, and all Class Vehicles will need repair or replacement of the CAMSHAFT COVER within the 15-year and 150,000-mile California Emissions Warranty period. However, at this time, with regard to the Class Vehicles, Defendant is refusing to

provide California Emissions Warranty coverage for CAMSHAFT COVER. When a CAMSHAFT COVER fails to work properly as described herein, it increases regulated emissions.

127. Further, there is a sufficient likelihood that Plaintiff and members of the Class will again be wronged in a similar way because Defendant is systemically continuing to fail to properly identify all parts that should properly and correctly be covered under the California Emissions Warranty as emissions-related parts and as high-priced. These parts include the parts identified in the "OBDII Summaries" and parts that increase regulated emissions that are not currently covered under Defendant's California Emissions Warranty. The CAMSHAFT COVER is only one example of Defendant's failure to properly cover parts under the California Emissions Warranty.

128. Further, as a result of Defendant's continuing failure to properly cover parts under the California Emissions Warranty, consumers are continuing to overpay for vehicles with a non-complaint California Emissions Warranty. An injunction is necessary to prevent this continuing and future misconduct.

129. Further, due to the extremely technical nuances of the CCR, due to a total lack of knowledge on the part of consumers with regard to how to determine if a part is an emissions-related warranted part, due to a total lack of knowledge on the part of consumers relating to the information necessary in order to calculate if a part is high-priced (because the analysis is supposed to use a historical hourly rate in the highest cost metropolitan area in California, use a formula based upon the consumer price index, use a historical part cost, etc.), it is simply not realistic that consumers will have any awareness of Defendant's wrongful conduct. Without an injunction to, *inter alia*, compel Defendant to cover the CAMSHAFT COVER under the California Emissions Warranty, Plaintiff and consumers generally will not be able to compel Defendant to cover the repair under warranty. Further, there is no way that the Court can ensure that Defendant will properly cover the CAMSHAFT COVER under

warranty, absent injunctive relief.

130.   Indeed, one element of the requested injunctive relief is that Defendant inform and notify members of the Class, via inserts to the warranty books or otherwise, that the CAMSHAFT COVER is an emissions-related part covered under the California Emissions Warranty.  Absent the requested injunctive relief, members of the Class do not, and will not, know that the CAMSHAFT COVER is a covered part (even if Defendant, in fact, may be covering the part under warranty).  As a result, members of the Class will not take their cars to Defendant for a warranted repair on the CAMSHAFT COVER because they do not know that the diagnosis and repair or replacement of the CAMSHAFT COVER is covered under the California Emissions Warranty, and, when they do take their vehicles for repairs to Defendant or elsewhere, they will not know that the diagnosis and repair or replacement for the CAMSHAFT COVER, in fact, is covered under the California Emissions Warranty.

131.   Further, Plaintiff would purchase Defendant's product in the future; however, Plaintiff will not purchase Defendant's product again because Plaintiff is not able to rely on Defendant's California Emissions Warranty in the future and so Plaintiff will be not purchase another of Defendant's vehicles, although Plaintiff would want to.  Absent injunctive relief, Plaintiff will not know whether it makes sense to spend money on another Defendant vehicle in the future on account of Defendant's noncompliance with the California Emissions Warranty, and Plaintiff and the members of the Class will have to deal with the same sort of warranty coverage issues again.

132.   Further, if Plaintiff or members of the Class purchase another Defendant vehicle in the future, they might reasonably, but incorrectly, assume that Defendant complied with all the requirements of the California Emissions Warranty, when it did not. Due to Defendant's continuing conduct, Plaintiff is unable to trust Defendant's California Emissions Warranty claims, is unable to rely on Defendant to properly identify parts that should properly be covered under the California Emissions

Warranty and has no way to determine whether Defendant's warranty representations are thorough or complete. Thus, absent injunctive relief, Plaintiff will have no way of knowing now, or in the future, whether Defendant, in fact, is complying with the California Emissions Warranty as required. To the extent that Plaintiff does not purchase another of Defendant's vehicles, it will be because, at least in part, Plaintiff is unable to rely on Defendant to comply with the requirements of the California Emissions Warranty.

**Plaintiff is Entitled to Public Injunctive Relief**

133. One form of injunctive relief provided under the UCL is "public injunctive relief." Accordingly, Plaintiff also seeks, in the alternative and/or as necessary, public injunctive relief in her individual capacity, for the benefit of the general public.

134. Indeed, the injunctive relief sought under the UCL has as its primary purpose and effect of prohibiting unlawful acts that threaten future injury to the general public.

135. Further, as alleged above, Plaintiff seeks to enjoin future violations of California's consumer protection statute, which by its very nature is relief oriented to, and for the benefit of, the general public. An injunction under the UCL is for the benefit of the general public and is designed to prevent further harm to the public at large.

136. Moreover, as alleged herein, the entire purpose of the California Emissions Warranty is to protect the environment and the general public, not just Class Members. The California Emissions Warranty was enacted by the State of California to restrict harmful greenhouse gas emissions from gasoline and hybrid gasoline engines. The fundamental purpose of the emissions requirements is to reduce emissions, limit fuel consumption and increase fuel efficiency, by forcing manufacturers to repair and/or replace failed emissions-related vehicle components under warranty, thereby decreasing greenhouse gas emissions, including carbon

dioxide emissions, to the general public. The California Legislature, through the enactment of the California Emissions Warranty, has clearly indicated that the goal of limiting regulated emissions is for the benefit of the public in general and not just purchasers of specific automobiles.

137. Defendant's misconduct is continuing, and Plaintiff's requested relief has the primary purpose and effect of protecting the public from Defendant's ongoing harm. All members of the public can become customers of Defendant at some time in the future, and even if they do not, this does not negate the fact that public injunctive relief will nevertheless offer benefits to the general public.

138. To the extent required, Plaintiff further alleges that the environmental harm suffered by the public can never be fully remedied through damages, and monetary damages will not make Plaintiff or the public whole. Money damages will not stop the environmental harm experienced by the public as a result of Defendant's violation of the emissions laws, which requires public injunctive relief. Indeed, environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable.

139. In addition, the issues and claims alleged herein are matters of significant public interest and are likely to recur. The proper interpretation of a statute (in this case, a California Regulation), including adjudicating whether Defendant's conduct violates the UCL, unquestionably presents a matter of public interest, as Defendant is continuing to misinterpret the California Emissions Warranty, including Sections 2035 and 2037.

140. Further, Defendant and other car manufacturers should not be able to shirk their legal responsibilities simply by paying money. Simply paying off consumers undermines the entire purpose of the California Emissions Warranty and will allow Defendant to continue violating the law and subjecting the public to increased harmful vehicle emissions by just paying money.

141. Accordingly, public injunctive relief is necessary and appropriate.

-32-
COMPLAINT

**Plaintiff Seeks Declaratory Relief**

142. Plaintiff also seeks declaratory relief and judgment, including pursuant to 28 U.S.C. section 2201, *et seq.,* on behalf of the members of the Class and/or in Plaintiff's individual capacity, declaring that Defendant's ongoing, future and/or past practices as alleged herein do not comply with the CCRs, including the California Emissions Warranty, and that *inter alia*: (1) the CAMSHAFT COVER in the Class Vehicles is an "emissions-related part" and/or high-priced" warranty part; and (2) Defendant has used, and continues to use, the wrong or incorrect standards for identifying "emission-related" parts and "high-priced warranty parts" under the California Emissions Warranty.

**CLASS ACTION ALLEGATIONS**

143. Except as to her claim for public injunctive relief, Plaintiff brings this action on her own behalf, and on behalf all those similarly situated as set forth in the Classes and Subclasses (the Classes and Subclasses are collectively referred to herein as "the Class") definitions below. Plaintiff brings this action on her own behalf, as well as on behalf of all Class members similarly situated, pursuant to Federal Rules of Civil Procedure Rules 23(a), (b)(1), (2) and/or (3) and/or (c)(4).

144. Plaintiff reserves the right to redefine the Classes and Subclasses and to add subclasses as appropriate based on further investigation, discovery, and specific theories of liability.

145. GM's California Emission Warranty applies to vehicles purchased and registered in California.

146. Accordingly, Plaintiff's proposed Class and Subclasses consist of and are defined as follows:

**Class and Subclass:**

All persons in the State of California who have been owners or lessees of CLASS VEHICLES and whose CAMSHAFT COVER are not covered for 7-years or 70,000-miles (the "California Class").

-33-
COMPLAINT

All persons in the State of California who have been owners or lessees of CLASS VEHICLES and who have paid for repairs and parts pertaining to defective CAMSHAFT COVER which occurred outside of the CLASS VEHICLES' powertrain warranty period but prior to 7-years or 70,000-miles (the "California Out-of-Pocket Subclass").

145.   Plaintiff reserves the right to establish other classes and subclasses.

146.   There is a well-defined community of interest, and the class is readily ascertainable:

(a)   Numerosity: As required by Fed. R. Civ. P. 23(a)(1), the members of the Class are so numerous that joinder of all Class members would be unfeasible and impractical, and the resolutions of their claims through the procedure of a class action will be of benefit to the Parties and the Court. The membership of the entire Class is unknown to Plaintiff at this time; however, the Class is estimated to be greater than one hundred (100) individuals and the identity of such membership is readily ascertainable by inspection of Defendant's records.

(b)   Typicality: As required by Fed. R. Civ. P. 23(a)(3), Plaintiff's claims are typical of the claims of all Class members since Plaintiff and all members of the Class suffered damages as result of Defendant's concealment and wrongful conduct set forth herein.

(c)   Adequacy: As required by Fed. R. Civ. P. 23(a)(4), Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has no interests adverse or antagonistic to those of the Class and has retained counsel competent and experienced in class action litigation who will zealously prosecute this matter on behalf of the Class to its conclusion. Plaintiff will fairly and adequately protect the interests of each Class member. Plaintiff acknowledges she has an obligation to make known any relationship, conflicts, or differences with any class member. Plaintiff's attorneys are well-versed in the rules governing class action discovery, certification, and settlement.

(d)   Commonality: There are common questions of law and fact as to the

Class (and subclass, if any) and that predominate over questions affecting only individuals, including but not limited to whether GM has engaged in fraud and unfair competition, and whether Plaintiff and Class Members are entitled to injunctive relief enjoining Defendants from continuing to omit the CAMSHAFT COVER as a part to which they are entitled to repair or replacement coverage under California's statutory emission warranties.

(e)     Superiority: As required by Fed. R. Civ. P. 23(b)(3), the nature of this action makes the use of class action adjudication superior to other methods. A class action will achieve economies of time, effort, and expense as compared with separate lawsuits, and will avoid inconsistent outcomes because the same issues can be adjudicated in the same manner and at the same time for the entire Class.

(f)     Defendant keeps extensive computerized records of its customers. Defendant has one or more databases through which a significant majority of Class members may be identified and ascertained, and it maintains contact information, including email and home mailing addresses, through which notice of this action could be disseminated in accordance with due process requirements.

147.   Class certification of Plaintiff's claims is also appropriate pursuant to, *inter alia,* Fed. R. Civ. P. 23(b)(2) and (c)(4) because Defendant has acted or refused to act on grounds generally applicable to Plaintiff and the Class, making appropriate both declaratory and injunctive relief with respect to Plaintiff and the Class.

## **TOLLING OF THE STATUTE OF LIMITATIONS**

148.   GM engaged in misleading and dishonest conduct relating to its failure to identify the CAMSHAFT COVER as covered pursuant to the California Code of Regulations regarding the California Emissions Warranty. Despite acting diligently, Plaintiff and Class members lacked the resources and had no realistic ability to identify the CAMSHAFT COVER as a part that should have been covered. Plaintiff and Class members cannot be reasonably expected on their own to learn or discover what parts should be covered under the California Emissions Warranty. Therefore,

the delayed discovery rule is applicable to the claims asserted by Plaintiff and Class members, and the statute of limitations for bringing the claims set forth herein should be tolled.

149. GM has actual and constructive knowledge that it is violating California law by failing to identify the CAMSHAFT COVER as a part that should be covered under the California Emissions Warranty. GM has concealed from Plaintiff and Class members that GM is violating California law as set forth herein. Any applicable statute of limitation is tolled by GM's wrongful conduct set forth herein, and GM is estopped from relying on any statute of limitation because of its conduct.

## **FIRST CAUSE OF ACTION**

### **VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 17200**

### **(By Plaintiff and the Class Against GM and Doe Defendants)**

150. Plaintiff re-alleges and incorporates by reference each allegation set forth above.

151. California Business and Professions Code section 17200, et seq. (the "UCL") prohibits "any unlawful, unfair or fraudulent business act or practice." GM has committed acts of unfair competition proscribed by the UCL, including the acts and practices alleged herein.

152. The UCL imposes strict liability. Plaintiff need not prove that GM intentionally or negligently engaged in unlawful or unfair business practices – only that such practices occurred.

153. GM is a "person" as defined by Business & Professions Code § 17201.

154. As a direct and proximate result of GM's acts and practices in violation of the UCL, Plaintiff and members of the Class have suffered injury in fact and lost money or property as set forth above and will continue to do so.

155. **Unlawful Prong**. A business practice is "unlawful" under the UCL if it is forbidden by law or regulations, including standard of professional conduct. The violation of any law or regulation may serve as the predicate for a violation of the

-36-
COMPLAINT

"unlawful" prong of the UCL.

156. GM failed to comply with the California Emissions Warranty requirements pursuant to the CCR by failing to provide 7-year and 70,000-mile warranty coverage for the CAMSHAFT COVER installed in the Class Vehicles where coverage should be provided pursuant to the CCR. The California Emissions Warranty applies to all Class Vehicles. 13 CCR 2037(a). Pursuant thereto, manufacturers shall warrant that their vehicles conform with the California Air Resources Board regulations and are free from defects which cause the failure of a warranted part to perform as described in the application for certification, including defects which would cause the vehicle's on-board diagnostic malfunction indicator to illuminate, for 3 years or 50,000 miles. 13 CCR 2037(b)(1)- (2). The vehicle manufacturer is GM, which is the manufacturer granted certification for the Class Vehicles. 13 CCR 2035(c)(5). The parts at issue are all warranted parts. The warranty period shall be 7 years and 70,000 miles for high-priced emissions parts. 13 CCR 2037(b)(3). High-priced emissions parts are those parts which, when taking into consideration the cost to diagnose, replace and pay for the failed part, exceed the cost limit defined in 13 CCR 2037(c)(3). The California Air Resources Board published memos which calculated the cost limit for the Class period. Although the CAMSHAFT COVER installed in the Class Vehicles exceeded the cost limit for the correlating years and should have received California Emissions Warranty coverage, GM failed to provide 7-year and 70,000-mile warranty coverage for said parts. The failure has resulted in damage to Plaintiff and members of the Class.

157. GM did not designate the parts at issue as "emissions-related" and/or high-priced warranted parts that should be covered by the 7-year and 70,000-mile California High-Priced Emissions-Related Parts Warranty. Thereby, GM also was able to avoid identifying the CAMSHAFT COVER installed in the Class Vehicles as defined herein where coverage should be provided pursuant to the CCR as being high-priced warranted parts in the warranty books for the Class vehicles, which

-37-
COMPLAINT

purport to identify all parts covered under the high-priced California Emissions Warranty for 7 years and 70,000 miles. Thus, GM's violation of Section 2037(c)(1)(B) directly affected communications with consumers. By violating Section 2037(c)(1)(B), GM was able to avoid disclosing in the warranty books that the CAMSHAFT COVER should have been included as high-priced warranted parts. GM's conduct also violates the unlawful prong in that GM has violated the CLRA as further alleged below.

158. GM's acts of unlawful competition as set forth above have caused members of the Class to suffer damage, present a continuing threat, and will persist and continue to do so unless and until this Court issues appropriate injunctive relief. Plaintiff also seeks attorneys' fees and costs pursuant to, inter alia, C.C.P. Section 1021.5.

159. **Unfair Prong**. GM's conduct violates the unfair prong of the UCL.

160. An act or practice is unfair if the consumer injury is substantial, is not outweighed by any countervailing benefits to consumers or to competition and is not an injury the consumers themselves could reasonably have avoided. An act or practice also is unfair if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. An act or practice also is unfair if Plaintiff's claims are "tethered" to specific constitutional, statutory or regulatory provisions. GM's conduct violates all of these definitions.

161. As alleged above, GM engages and has engaged in a systematic business practice of intentionally failing to identify in the Class Vehicles' warranty books at the time of distribution, and in resources provided to its dealerships, numerous parts that GM is obligated to identify as high-priced warranted parts and emission-related parts by operation of law, including specifically the CAMSHAFT COVER installed in the Class Vehicles where coverage should be provided pursuant to the CCR. GM does this in an effort to reduce the amount of money that GM spends on warranty-related repairs knowing that it would be very difficult if not

-38-

COMPLAINT

impossible for most consumers to discover this unlawful conduct on their own. If GM complied with California law and properly identified the CAMSHAFT COVER as a high-priced warranted part, then GM dealerships would properly provide warranty coverage for said parts. Further, GM's conduct is unfair because it intentionally refuses to provide warranty coverage for the CAMSHAFT COVER installed in the Class Vehicles as defined herein for the sole purpose of wrongfully limiting its warranty claims, with no regard for the fact that the public is being forced to pay for repairs which should be covered under the 7-year and 70,000-mile California Emissions Warranty. Plaintiff and members of the Class have suffered injury in fact and lost money or property as a result of GM's unfair business acts and practices as set forth in detail.

162. GM's failure to properly identify the CAMSHAFT COVER installed in the Class Vehicles where coverage should be provided pursuant to the CCR, is a uniform, systematic, and intentional business practice on the part of GM to minimize the amount of money that GM has to pay out in warranty claims. This conduct violates California law.

163. As a direct and proximate result of GM's acts and practices in violation of the UCL, Plaintiff and members of the Class have paid out of pocket to repair or replace the CAMSHAFT COVER installed in the Class Vehicles where coverage should be provided pursuant to the CCR and/or other high-priced warranted parts and emissions-related parts as defined herein that should have been covered by GM under the 7-year and 70,000-mile California Emissions Warranty. As a result, consumers were denied warranty coverage, which is clearly unfair. GM's conduct does not benefit consumers or competition. Plaintiff and members of the Class could not reasonably avoid the injury each of them suffered or will suffer, which injury is substantial. GM's conduct only benefits GM, by GM wrongfully avoiding having to pay warranty claims which should be covered by the California Emissions Warranty.

164. The gravity of the consequences of GM's conduct as described above

-39-

outweighs the justification, motive or reason therefor, is immoral, unethical and unscrupulous. GM's conduct also offends established public policy that is tethered to legislatively declared policies as set forth in the laws detailed above, including California laws and regulations regarding the California Emissions Warranty, or is substantially injurious to the public, for the reasons set forth above.

165. To the extent that any definition of "unfair" requires a balancing test or weighing various factors, such an inquiry is fact intensive and requires a full factual record as to GM's justification and motives for its conduct, and as to the impact of GM's conduct on Plaintiff and members of the Class.

166. GM's acts of unfair competition as set forth above present a continuing threat and will persist and continue to do so unless and until this Court issues appropriate injunctive relief.

167. Plaintiff also seeks attorneys' fees and costs pursuant to, inter alia, Cal. Code Civ. Proc. § 1021.5.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, prays for relief and judgment against GM as follows:

1. For an order certifying this case as a class action, appointing Plaintiff as the representative of the Classes and Subclasses, and appointing counsel for Plaintiff as Class Counsel;

2. That the Court declare, adjudge and decree that that GM is financially responsible for notifying all Class members about the wrongful conduct set forth herein; that GM's conduct as alleged herein violates the California Emissions Warranty including, without limitation, because GM has used, and continues to use, the wrong or incorrect standards for identifying "emissions-related" CAMSHAFT COVER under the California Emissions Warranty; GM failed and is failing to properly identify and warrant under the California Emissions Warranty the CAMSHAFT COVER as properly covered for emissions-related defects as identified

and limited as described herein, and/or that Plaintiff and the members of the Class are entitled to warranty coverage under California Emissions Warranty for the CAMSHAFT COVER, which should be properly identified as a warranted part under the California Emissions Warranty as described or defined herein; and, an order requiring GM to, *inter alia*, review its warranty books for all Class Vehicles and properly identify and warrant the CAMSHAFT COVER and, on a going forward basis, use the proper standard for determining whether the CAMSHAFT COVER is "emissions-related" under the California Emissions Warranty;

3. That the Court declare, adjudge and decree that that GM is responsible for notifying all Class members about the wrongful conduct set forth herein;

4. That the Court declare, adjudge and decree that GM's failure to identify and warrant the CAMSHAFT COVER as described herein pursuant to the California Emissions Warranty constitutes an unfair and unlawful business practice in violation of California Business and Professions, Civil Code sections 17200, *et seq.*;

5. For declaratory relief pursuant to 28 U.S.C. section 2201 that GM is in violation of, and must comply with, the California Emissions Warranty namely, that GM, *inter alia*, identify and cover the CAMSHAFT COVER as described herein under the California Emissions Warranty;

6. For an order declaring and enjoining GM from further unfair and unlawful distribution, sales, and lease practices and compelling Defendant to properly and fully identify that the CAMSHAFT COVER as described herein are covered pursuant to the California Emissions Warranty. As ancillary relief and as a result of the declaratory and/or injunctive relief to be obtained, GM will provide restitution for amounts wrongfully paid by Plaintiff and Class members relating to these repairs which should have been covered by GM under the California Emissions Warranty;

7. For an award of restitution to Plaintiff and Class members of any repair costs they are owed;

-41-
COMPLAINT

8.　　For the appointment of a receiver, as necessary to receive, manage and distribute any and all funds from GM that are determined to have been wrongfully acquired by GM as a result of violations of California Business & Professions Code sections 17200, *et seq.*;

9.　　For an award of attorneys' fees and costs pursuant to California Code of Civil Procedure § 1021.5, or as may otherwise be allowed by law;

10.　　For an award of pre-judgment and post-judgment interest;

11.　　For leave to amend the Complaint to conform to the evidence produced at trial; and,

12.　　For all other relief as may be appropriate under the circumstances.

Dated: November 30, 2025　　　　　　　　　　Respectfully submitted,

**POMERANTZ LLP**
**THE LAW OFFICE OF ROBERT STARR**
**FRONTIER LAW CENTER**

By:＿＿＿＿＿＿/s/ Robert L. Starr＿＿＿＿＿＿
　　　　　　　Jordan L. Lurie
　　　　　　　Ari Y. Basser
　　　　　　　Robert L. Starr
　　　　　　　Adam Rose

*Attorneys for Plaintiff*

-42-
COMPLAINT